# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ERIC ALLSBROOK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:25-CV-249 |
| | ) |
| CITY OF ALBEMARLE, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, Chief District Judge.

The plaintiff Eric Allsbrook was employed as a housing inspector for the City of Albemarle from 2008 until June 2023. He contends the City terminated his employment in violation of his First Amendment rights and North Carolina public policy, asserting that the City acted in retaliation for complaints he made about the Housing Department in April 2021. Because Mr. Allsbrook has not produced evidence sufficient to raise a genuine issue of fact on the requisite causation element of his claims, the City's summary judgment motion will be granted.

## I.      Facts[1]

Mr. Allsbrook began employment with the City's Public Housing Division in 2008, as a Section 8 Inspector. Doc. 23-2 at 5, Dep. 14–15.[2] In April 2021, Mr.

---

[1] The facts as recited are either undisputed or viewed in the light most favorable to Mr. Allsbrook, as required at this stage of the proceedings.

[2]  In citations to the condensed transcript of deposition of Mr. Allsbrook, the court provides first the ECF page number followed by the internal deposition page number.

Allsbrook "spoke out about issues related to conditions within the facilities" in the Section 8 program, both to the city council and to the federal department of Housing and Urban Development (HUD). Doc. 23-2 at 9–10, Dep. 33–34. Around that time, Mr. Allsbrook also "told HUD officials about incidents involving theft of tools, lawn mowers and other equipment by T.P.,"[3] and "misuse of federal funds by T.P.," who was a maintenance supervisor. Doc. 23-2 at 11–12, Dep. 39–42; *see* Doc. 23-5 at p. 2 ¶ 5. The City investigated the alleged misconduct and misappropriation of City property and terminated T.P. in November 2021. Doc. 23-5 at p. 2 ¶¶ 6–8.

Dr. Kim Scott became the Public Housing Director starting in January 2022 and served as Mr. Allsbrook's supervisor. Doc. 23-3 at pp. 1–2 ¶¶ 3–4. Mr. Allsbrook also reported to Assistant Director Darlene Hughes. Doc. 23-5 at pp.1–2 ¶ 4.

In 2022, the Public Housing Department undertook to improve its performance on the HUD Real Estate Assessment Center (REAC) inspection. Doc. 23-3 at p.2 ¶ 5. "Mr. Allsbrook was involved in this process and contributed to the department's efforts to achiev[e] a passing score after several years of failing to pass the inspection." *Id.*

After the City achieved a passing score, Dr. Scott and Ms. Hughes wrote Human Resources Director Dana Chaney on June 24, 2022, stating that Mr. Allsbrook was "instrumental in the department passing the REAC inspection," and recommending him for reclassification as Facilities Maintenance Supervisor and a salary increase. Doc. 23-5

---

[3] The name "T.P." is designated by initials in the record documents, with indication that the full name was redacted before filing. *See, e.g.,* Doc. 23-2 at 11, Dep. 39.

at 16; *see* Doc. 23-5 at p. 3 ¶ 11.  Ms. Hughes also requested added compensation for Mr. Allsbrook on July 25, 2022, and Dr. Scott described Mr. Allsbrook in a letter "To Whom it May Concern" on August 24, 2022, as "not only highly experienced but also a well-versed man with all the necessary qualifications to successfully manage facility and properties."  Doc. 25-2 at 1–2; Doc. 25-3.

Dr. Scott and Ms. Hughes met with Ms. Chaney on September 7, 2022, to discuss the possibility of a promotion or raise.  Doc. 23-3 at p. 2 ¶ 6; Doc. 23-5 at pp. 3–4 ¶ 12.  "At that time, there was no budgeted maintenance supervisor position and Dr. Scott did not recommend reclassification for Mr. Allsbrook's position."  Doc. 23-5 at pp. 3–4 ¶ 12; *see* Doc. 23-3 at p. 2 ¶ 6.  They also "reviewed Mr. Allsbrook's pay history" and determined that he was being compensated appropriately.  Doc. 23-5 at pp. 3–4 ¶ 12.

On September 13, 2022, Ms. Chaney sent Mr. Allsbrook a letter noting that, following their meeting, Dr. Scott and Ms. Hughes "did not recommend reclassification of [Mr. Allsbrook] position or promotion at [that] time."  Doc. 23-3 at 10; *see id.* at p. 2 ¶ 6; Doc. 23-5 at pp. 3–4 ¶ 12.  Ms. Chaney further detailed the bases for Mr. Allsbrook's salary and noted limitations on budget availability for "maintenance positions in the current fiscal year."  Doc. 23-3 at 10; *see id.* at p. 2 ¶ 6; Doc. 23-5 at pp. 3–4 ¶ 12.

Two months later, on November 14, 2022, the City issued a "Corrective Action" to Mr. Allsbrook, based on "multiple missed punches" on his time card.  Doc. 23-3 at 14.  On February 3, 2023, Dr. Scott issued a second Corrective Action to Mr. Allsbrook, based on the determination that he "needs to follow instructions and communicate effectively with his Supervisor and Department Director."  *Id.* at 18; *see id.* at pp. 4–5 ¶ 15.  This

second Corrective Action listed three "Concern[s]," described as an inspection conducted without approval, maintenance work completed without permission, and instructing a tenant to not report her entire income. *Id.* at 18.

In that same month, "the organization's financial position stabilized and improved" and the City posted "the Facilities Maintenance Supervisory position," which had been subject of discussion at the September 2022 meeting with Ms. Chaney. Doc. 23-5 at p. 4 ¶ 14. The City advertised the position, received ten applications, and interviewed six candidates, including Mr. Allsbrook. *Id.* at ¶¶ 15–16. The interview panel consisted of Dr. Scott and Ms. Hughes, as well as Director of Public Works Ross Holshouser, and Assistant Director of Public Utilities Bryan Hinson. *Id.* at ¶ 16.

According to Ms. Chaney, "[b]ased on the feedback received from the interview panel, Mr. Allsbrook's responses did not demonstrate the level of commitment or accountability the department required for the role." *Id.* at p. 5 ¶ 17. "Of the six individuals interviewed, Mr. Allsbrook was not among the top candidates," and he "was not offered the position because he was not the most qualified candidate and because of his performance issues." *Id.* at ¶¶ 17, 20. The City instead hired another candidate "based on [his] strong qualifications, years of relevant experience, and HVAC credentials." *Id.* at ¶ 18.

Dr. Scott issued a third Corrective Action to Mr. Allsbrook on April 4, 2023, listing four "Concern[s]," described as including being consistently late for inspections, not completing inspection checklists, and making "numerous negative comments to new employees." Doc. 23-3 at 21–22.

4

The City continued to receive tenant complaints in April 2023 about Mr. Allsbrook and then hired an independent investigator to interview witnesses "including tenants, contractors, and property owners," about Mr. Allsbrook's performance. *Id.* at pp. 6–7 ¶¶ 17–19. The investigative report, issued in early May 2023, documented "unprofessional" conduct by Mr. Allsbrook. *Id.* at 26–27; *id.* at p. 7 ¶ 19.

A couple of weeks later, Ms. Hughes expressed "serious concerns" about Mr. Allsbrook to Ms. Cheney, following a report from a tenant about Mr. Allsbrook's failure to conduct inspections in May 2023. Doc. 23-5 at pp. 10–11 ¶ 37. Ms. Hughes noted that she and Dr. Scott had discussed similar performance issues with Mr. Allsbrook, that he had prior "write ups," and that "we must do something," raising the possibility of terminating his employment or taking him off inspections. *Id.* at 21.

Dr. Scott recommended Mr. Allsbrook's termination in a meeting June 1, 2023, with Ms. Hughes and Ms. Chaney. *Id.* at p. 11 ¶ 38; Doc. 23-3 at p. 7 ¶ 20. Dr. Scott issued a pre-dismissal conference notice to Mr. Allsbrook June 5, 2023, noting examples of Mr. Allsbrook's "inefficiency, negligence, or incompetence in the performance of duties." Doc. 23-3 at 29. After considering Mr. Allsbrook's response and his history of performance issues, Dr. Scott on behalf of the City sent a termination letter to Mr. Allsbrook June 8, 2023. *Id.* at 31; *id.* at p. 8 ¶ 22; Doc. 23-5 at p. 11 ¶¶ 38–40.

Additional facts, disputed and undisputed, will be discussed in context as needed.

## II. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023). The moving party has the initial burden of demonstrating the absence of any material issue of fact; once the moving party meets its initial burden, the non-moving party must come forward with evidentiary material demonstrating the existence of a genuine issue of material fact requiring a trial. *Id.* at 709–10.

### III. First Amendment Retaliation Claim

Mr. Allsbrook asserts that the City terminated his employment in retaliation for his April 2021 complaints about the Housing Department. Doc. 11 at pp. 9–10 ¶¶ 50, 58; Doc. 25 at 4–6.[4]

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). The elements of a First Amendment retaliation claim are that: "(1) the plaintiff engaged in

---

[4] In his complaint, Mr. Allsbrook captions this claim as a "Fourteenth Amendment – Equal Protection Claim" "for age discrimination and retaliation under 42 U.S.C. § 1983." Doc. 11 at 10. In response to the City's motion, Mr. Allsbrook concedes he cannot bring an Equal Protection Claim on the basis of age discrimination and that his retaliation claim must be based on the First Amendment. Doc. 25 at 3, 5–6. Contrary to the City's contention, Doc. 26 at 2, Mr. Allsbrook sufficiently pleaded a First Amendment claim through his factual allegations despite the lack of express reference to the First Amendment in the complaint. *See Peters v. Jenney*, 327 F.3d 307, 321–22 (4th Cir. 2003); *see* Doc. 11 at pp. 3–5 ¶¶ 16–31, pp. 9–10 ¶¶ 50, 58.

protected First Amendment activity, (2) the defendants took some action that adversely affected the plaintiff's First Amendment rights, and (3) there was a causal relationship between the plaintiff's protected activity and the defendants' conduct." *Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017) (cleaned up).

Here, the causation element is dispositive. That element "asks whether the considerations which animated the defendant's conduct were permissible or impermissible." *Martin v. Duffy*, 977 F.3d 294, 300 (4th Cir. 2020). At the summary judgment stage, the causation inquiry proceeds in two steps. "The initial burden lies with the plaintiff, who must show that his protected expression was a 'substantial' or 'motivating' factor in the employer's decision to terminate him." *Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "If the plaintiff successfully makes that showing, the defendant still may avoid liability if he can show . . . the protected speech was not the but for cause of the termination." *Id.* (citing *Mt. Healthy*, 429 U.S. at 287); *see Hill v. Town of Mocksville*, No. 20-CV-653, 2021 WL 6123985, at *8–9 (M.D.N.C. Dec. 21, 2021).

All of the evidence shows that the City terminated Mr. Allsbrook's employment because of deficiencies in his performance. Doc. 23-3 at 29, 31; *id.* at pp. 7–8 ¶¶ 20–22; Doc. 23-5 at p. 11 ¶¶ 38–40. There is no evidence giving rise to an inference of any connection between his speech in April 2021 to his termination over two years later. The time gap is too great by itself to permit an inference of causation. *See Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582–83 (4th Cir. 2023); *Wagner*, 13 F.3d at 91. And there is otherwise no evidence of a retaliatory motive on the part of Mr. Allsbrook's

7

supervisors or the City.  Doc. 23-3 at 29, 31; *id.* at pp. 7–8 ¶¶ 20–22; Doc. 23-5 at p. 11 ¶¶ 38–40.  Mr. Allsbrook has not met his initial burden to show his protected speech was a substantial or motivating factor in his termination.  In addition, for the same reason, there is no genuine issue that retaliation was the "but for cause of the termination." *Wagner*, 13 F.3d at 90.

Mr. Allsbrook maintains that causation can be inferred because of positive "contemporaneous assessments" of his performance in 2022.  Doc. 25 at 4.  He points to letters and emails from Dr. Scott and Ms. Hughes in July and August 2022 supporting his promotion and increase in pay, as well as "several other letters that speak to Allsbrook's competency, work ethic and support."  *Id.*; *see* Docs. 25-3 to 25-9.  He contends these assessments show that "the performance rationale the City now offers is pretextual," and "unworthy of credence."  Doc. 25 at 4 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).

Mr. Allsbrook's contention is unavailing on multiple levels.  First, the letters from co-workers and residents are not under oath.  Docs. 25-5 to 25-9; *see* Fed. R. Evid. 801(c)(2), 802, 901(a).  Second, these five documents are not probative of pretext because they do not show the "perception of the decision maker" in Mr. Allsbrook's termination.  *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 248 (4th Cir. 2020) (cleaned up).

Third, the letters and emails by Dr. Scott and Ms. Hughes came before the problems with Mr. Allsbrook's work were identified and before he received "write ups" about his unsatisfactory work performance.  *See* Doc. 23-5 at 21.  They say nothing about the reasons given for the termination many months later.  Docs. 25-2, 25-3, 25-4.  By the

8

time he applied for a promotion in February 2023, the City declined to offer it to him because he was "not the most qualified candidate and because of his performance issues." Doc. 23-5 at p. 5 ¶¶ 17, 20. This evidence does not tend to show the reasons given for the corrective actions and the termination were "unworthy of credence" or "false." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 257 (4th Cir. 2025) (cleaned up).

Mr. Allsbrook suggests that an inference of causation can be drawn because "the same supervisory structure that praised Allsbrook in writing in mid-2022 pivoted to a cascade of corrective actions and then termination, with no corresponding change in his actual duties." Doc. 25 at 6. He asserts this is a "reversal from which a jury could find the requisite animus." *Id.* There is nothing in the law, however, that prevents an employer from reassessing an employee's performance over time, as happened here. Doc. 23-3 at pp. 2–3 ¶¶ 6, 12–13. While Mr. Allsbrook suggests that his supervisors were quick to change their opinion of him, it is not the province of the Court "to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (cleaned up). Because Mr. Allsbrook's protected speech in 2021 preceded the supervisory praise he received in 2022 and was well before his job ended in 2023, it is not plausible to infer the First Amendment activity was the cause of the termination.

Mr. Allsbrook suggests that the "corrective actions" are themselves retaliatory actions that constitute "evidence of recurring retaliatory animus during the intervening period" between his protected activity and his termination. Doc. 25 at 6. But this suggestion is without merit, because there is nothing in the corrective actions to suggest a

9

retaliatory motive. They, like the termination itself, are based on Mr. Allsbrook's own conduct and complaints received after November 2022, and they make no reference to his conduct in April 2021. Doc. 23-3 at 14, 18, 21–22. Further, the corrective actions are themselves too far removed in time from April 2021 to create an inference of retaliation. *See Porter*, 72 F.4th at 582; *Wagner*, 13 F.3d at 91.

Mr. Allsbrook cites *Lettieri v. Equant, Inc.*, 478 F.3d 640 (4th Cir. 2007), in support of his claim. But, *Lettieri* is distinguishable in key respects that show the shortcomings in Mr. Allsbrook's case. There the Fourth Circuit held that the plaintiff made a sufficient prima facie showing of causal connection despite a time interval of seven months because her employer "stripped [her] of job responsibilities" and "took away her authority" in the interim. *Id.* at 651. The plaintiff's supervisor "reduced her supervisory responsibilities over the sales team and took away her authority to set prices and meet directly with Sprint clients." *Id.* "These steps made it easier for [the supervisor] to take the position later that [the plaintiff] was not needed and should be terminated." *Id.* Here, by contrast, for over a year after Mr. Allsbrook's protected activity, his supervisors praised his performance and supported his advancement. Doc. 23-3 at p. 2 ¶¶ 5–6; Doc. 23-5 at 16; *id.* at p. 3 ¶ 11; Doc. 25–2; Doc. 25–3. All the evidence shows that Mr. Allsbrook's own conduct formed the basis for the corrective actions that led to his termination. Doc. 23-3 at 14, 18, 21–22, 29, 31; *id.* at p. 8 ¶ 22; Doc. 23-5 at p. 11 ¶¶ 38–40.

10

Mr. Allsbrook has not demonstrated a genuine issue of material fact on the causation element.[5]  The City is therefore entitled to summary judgment on his First Amendment claim.

## IV.     State Law Wrongful Termination Claim

Mr. Allsbrook's state law claim for wrongful termination in violation of public policy turns on the same causation element as his First Amendment claim.[6]

Under North Carolina law, "to establish a prima facie case of retaliation, it must be shown that (1) the plaintiff engaged in a protected activity, (2) the employer took adverse action, and (3) there existed a causal connection between the protected activity and the adverse action." *Brewer v. Cabarrus Plastics, Inc.*, 130 N.C. App. 681, 690, 504 S.E.2d 580, 586 (1998).  For the causation element, "there must be something more . . . than mere speculation that an employee was fired for an improper purpose." *Salter v. E & J Healthcare, Inc.*, 155 N.C. App. 685, 694–95, 575 S.E.2d 46, 52 (2003).

---

[5]  As summary judgment is awarded on this basis, the Court does not reach the City's alternative ground for summary judgment on this claim, based on the contention that Mr. Allsbrook has not set forth evidence showing that Dr. Scott was a municipal policy maker to attribute liability to the City under § 1983.  *See* Doc. 26 at 2–3.  The Court also does not reach Mr. Allsbrook's arguments concerning the remaining elements of the claim.  *See* Doc. 25 at 5–6.

[6]  The City construes the complaint as including a claim under the North Carolina Equal Employment Practices Act (NCEEPA) for retaliation or a state law claim for age discrimination. Doc. 24 at 17–20.  But, Mr. Allsbrook confirms in response to the City's motion that he does not assert a NCEEPA claim for retaliation or a claim for age discrimination, and that his wrongful discharge claim is limited to one for violation of public policy, based on retaliation for speaking out in April 2021.  Doc. 25 at 7.  The court addresses in its analysis here the claim as limited by the plaintiff.  To the extent the complaint suggests any additional claim, Mr. Allsbrook has not met his burden of demonstrating a genuine issue of material fact.

11

North Carolina courts use the same causation standard applied in federal First Amendment retaliation cases: an employee must first show "that the protected activity was a substantial causative factor in the employee's termination." *Brooks v. Stroh Brewery Co.*, 95 N.C. App. 226, 230, 382 S.E.2d 874, 878 (1989) (citing, among other cases, *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 285–87 (1977)). "The termination itself must be motivated by an unlawful reason or purpose that is against public policy." *Garner v. Rentenbach Constructors Inc.*, 350 N.C. 567, 571–72, 515 S.E.2d 438, 441 (1999). If this test is met, the burden shifts to the employer to show "it would have treated the employee/complainant in the same manner in the absence of protected activity." *Brooks*, 95 N.C. App. at 230; *see Swain v. Elfland*, 145 N.C. App. 383, 386–87, 550 S.E.2d 530, 533 (2001) (stating that to survive summary judgment a "plaintiff must forecast sufficient evidence . . . [that] protected speech or activity was the 'motivating' or 'but for' cause for his discharge").

The City is entitled to summary judgment on the causation element of Mr. Allsbrook's state law claim for the same reason it prevails on his First Amendment claim. All of the evidence shows that the City terminated his employment because of his performance and not because of protected activity. In addition, there is no evidence in the record showing that Mr. Allsbrook's protected activity was a but-for cause of his termination.

Mr. Allsbrook cites *Shook v. NCG Acquisition, LLC*, 114 F.4th 242 (4th Cir. 2024) for the proposition that "disputes over the employer's motive . . . 'must be saved for a later stage in the litigation.'" Doc. 25 at 10 (quoting 114 F.4th at 250 n.2). *Shook*,

12

however, is inapposite because it addressed whether the plaintiff had stated a claim for wrongful termination in violation of public policy "at the pleading stage." 114 F.4th at 249. The court rejected the employer's invitation "to consider its proffered reasons for terminating" the plaintiffs. *Id.* at 250 n.2. "This we cannot do," it said, because "[i]t is well-established that courts must not entertain factual disputes on a Rule 12(b)(6) motion to dismiss." *Id.* Here, by contrast, the City's evidence establishes a non-retaliatory motive for its actions, which then moves the burden to Mr. Allsbrook to show a genuine issue of material fact on the element of causation. *See Garner*, 350 N.C. at 572 (considering the defendant's reason for termination in granting summary judgment). Mr. Allsbrook has not brought forth any evidence that the City was "motivated by" retaliation in terminating him, *id.*, nor that retaliation was the but for cause of the termination. *Brooks*, 95 N.C. App. at 230. Summary judgment thus must be awarded to the City.

## V. State Constitutional Claim

Mr. Allsbrook asserts in his brief a claim under Article I, Section I of the North Carolina Constitution, "enjoyment of the fruits of their own labor" provision. Doc. 25 at 11. He asserts that the North Carolina Supreme Court has held that "a governmental employer violates that right when it subjects an employee to adverse action by arbitrarily disregarding the procedures it promulgated to ensure a fair process." *Id.* (citing *Tully v. City of Wilmington*, 370 N.C. 527, 537–39, 810 S.E.2d 208, 216–17 (2018) and *Corum v. Univ. of N.C.*, 330 N.C. 761, 782–86, 413 S.E.2d 276, 289–91 (1992)). He claims the City "arbitrarily disregarded its own pre-dismissal-conference, progressive-discipline, and grievance procedures in terminating Allsbrook." *Id.*

13

Mr. Allsbrook did not plead a state constitutional claim in his complaint, nor did he put forth any factual allegations supporting such a claim. *See* Doc. 11 at 1–13. The only state law claim in the complaint is wrongful termination in violation of public policy, based upon retaliation for his April 2021 speech. *See id.* at pp. 12–13 ¶¶ 51–61.

The City contends that the Court should disregard Mr. Allsbrook's assertion of a state constitutional claim, because it was raised the first time in his brief. The Court agrees. Mr. Allsbrook cannot amend his complaint through his brief. *S. Walk at Broadlands Homeowners Ass'n, Inc. v. OpenBand at Broadlands, LLC,* 713 F.3d.175, 184 (4th Cir. 2013); *see Li v. Shepherd Univ.,* No. 20–1967, 2022 WL 16919271, at *1 (4th Cir. Nov. 14, 2022) (per curiam). Mr. Allsbrook also has not shown good cause to amend his complaint at this late juncture, well past the deadline for doing so. Fed. R. Civ. P. 16(b)(4); *see* Doc. 15 at 4; Text Order 06/12/2025 (setting September 1, 2025, deadline for motions to amend the pleadings).

Further, Mr. Allsbrook has not alleged facts or brought forth evidence at summary judgment supporting such a claim. The undisputed evidence in the record shows that Mr. Allsbrook received three written corrective actions, was suspended without pay for two days after the third, was given the opportunity to attend a pre-dismissal conference and provide a response, and was given post-dismissal opportunity to appeal, consistent with the procedures in the employee handbook. Doc. 23-3 at 28–29, 31; *id.* at pp. 3–8, ¶¶ 12, 15, 16, 21–22; Doc. 23-5 at pp. 11–12 ¶¶ 40–41; *id.* at 35–37.

14

Mr. Allsbrook's state constitutional claim is not properly before the court, as it was not raised in the pleadings.  In addition and in the alternative, there is no evidentiary basis to allow it to proceed to trial.

## VI.     Conclusion

Mr. Allsbrook's claims all run into the same insurmountable hurdle:  the evidence is undisputed that the City terminated him due to his job performance, and there is insufficient evidence to support an inference that retaliation for his public statements caused or played a role in the decision.  Thus, no reasonable jury could find that the City's actions were the result of retaliatory intent, in whole or in part.  Additional claims suggested in the complaint and Mr. Allsbrook's brief are not properly pleaded or supported by the record.  The City's motion for summary judgment will be granted.

It is **ORDERED** that the defendant's motion for summary judgment, Doc. 23, is **GRANTED**.  Judgment will be entered separately as time permits.

This the 20th day of July, 2026.

_____
UNITED STATES DISTRICT JUDGE

15